Docket No. 12-17398

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN INGRAM, on behalf of himself and all others similarly situated,

*Plaintiff-Appellant*

v.

VIVUS, INC., LELAND F. WILSON and WESLEY W. DAY, Ph.D.,

*Defendants-Appellees*

Appeal from the United States District Court for the Northern District of California

No. 4:10-cv-04957-PJH

The Honorable Phyllis J. Hamilton

ANSWERING BRIEF
OF DEFENDANTS-APPELLEES

Norman J. Blears (CSB #95600)
Michael L. Charlson (CSB #122125)
HOGAN LOVELLS US LLP
525 University Avenue, 4th Floor
Palo Alto, California  94301
Telephone:  (650) 463-4000
Facsimile:   (650) 463-4199

Benjamin T. Diggs (CSB #245904)
HOGAN LOVELLS US LLP
Three Embarcadero Center, 15th Floor
San Francisco, California  94111
Telephone:  (415) 374-2300
Facsimile:   (415) 374-2499

*Attorneys for Defendants-Appellees VIVUS, Inc.,*
*Leland F. Wilson and Wesley W. Day, Ph.D.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26-1 of Federal Rule of Appellate Procedure,

Defendant-Appellee Vivus, Inc. ("VIVUS") has no parent corporation, and

no publicly held company owns 10% or more of VIVUS's stock.

Defendants-Appellees Leland F. Wilson and Wesley W. Day, Ph.D. are

individuals, not corporate parties, do not issue stock, and are not controlled

by any publicly-held corporation.


DATED:    April 11, 2013        HOGAN LOVELLS US LLP


                                By */s/ Michael L. Charlson*
                                    Michael L. Charlson

                                Attorneys for Defendants-Appellees
                                Vivus, Inc., Leland F. Wilson and
                                Wesley W. Day, Ph.D.

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................. 1

STATEMENT OF THE ISSUES .................................................. 5

STATEMENT OF THE CASE ...................................................... 6

    I.    Nature of the Case ...................................................... 6

    II.   Course of Proceedings and Disposition Below ......................... 7

STATEMENT OF FACTS ........................................................... 8

    I.    Statements About Qnexa and the Clinical Trial Results ............ 9

    II.   Briefing Document Disclosures and Later Committee
           Meeting and Vote ...................................................... 11

    III.  Plaintiff's Fraud Allegations ........................................ 12

    IV.  Subsequent FDA Panel Vote and Approval of Qnexa ............. 13

SUMMARY OF ARGUMENT .................................................... 14

ARGUMENT ...................................................................... 16

    I.    STANDARD OF REVIEW ............................................... 16

    II.   PLAINTIFF MISSTATES THE APPLICABLE LEGAL
           STANDARDS .......................................................... 17

    III.  PLAINTIFF FAILS TO ALLEGE ANY MATERIALLY
           FALSE OR MISLEADING STATEMENTS ......................... 20

# TABLE OF CONTENTS
(Continued)

**Page**

A.  Defendants Disclosed the Risks Plaintiff Says Were Hidden ........................................................................ 20

B.  The Market Reaction Supports Defendants' Statements 22

C.  The Court Considered Plaintiff's "Theory of the Case" and Found It Implausible and Unsupported by Alleged Facts. ............................................................................ 25

D.  The District Court Drew All Appropriate Inferences In Finding That Plaintiff Failed to Allege Any Materially False or Misleading Statements. ................................... 29

E.  Statements of General Optimism Are Not Actionable .. 47

F.  Plaintiff's Claims Are Barred by the PSLRA Safe Harbors ........................................................................ 49

IV.  THE ALLEGATIONS DO NOT SUPPORT A STRONG INFERENCE OF SCIENTER ................................................. 50

A.  The Confidential Witness Allegations Add Nothing ..... 53

B.  Plaintiff's Additional Motive Allegations Do Not Change the Scienter Analysis ................................... 57

V.  PLAINTIFF'S SECTION 20 CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION ................................ 59

VI.  THE DISTRICT COURT PROPERLY DENIED LEAVE TO AMEND AGAIN ................................................. 59

VII.  CONCLUSION ....................................................................... 61

iii

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Applestein v. Medivation*, *Inc.*, No. C-10-0998 EMC,
  2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ........................................... 53

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................... 16, 18

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .......................................................................56

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir 1999) ......................................................................25

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ...................................................... 18, 19, 38

*Cardenas v. NBTY, Inc.*,
  870 F.Supp.2d 984 (E.D. Cal. 2012) ......................................................... 17

*City of Livonia Employees's Ret. Sys. & Local 295/Local 851 v. Boeing
  Co.*, Nos. 12-1899,12-2009, 2013 WL 1197791
  (7th Cir. Mar. 26, 2013) .............................................................................. 53

*Clegg v. Cult Awareness Network*,
  18 F.3d 752 (9th Cir. 1994) ....................................................................... 18

*Construction Laborers Pension Trust v. Neurocrine Biosciences, Inc.*,
  No. 07-cv-1111-IEG-RBB,
  2008 WL 2053733 (S.D. Cal. May 13, 2008) ...................................... 54, 58

*DeMarco v. DepoTech Corp.*,
  149 F.Supp.2d 1212 (S.D. Cal. 2001) ....................................................... 34

*Desai v. General Growth Prop., Inc.*,
  654 F.Supp.2d 836 (N. D. Ill. 2009) .......................................................... 50

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ................................................................... 60

iv

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Foster v. Wilson*,
   504 F.3d 1046 (9th Cir. 2007) ................................................... 16

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ................................................. 50

*Heywood v. Cell Therapeutics, Inc.*, No. C 05-0396 RSM
   2006 WL 5701625 (W.D. Wash. May 4, 2006) ................................... 28, 55

*Huberman v. Tag-It Pac. Inc.*,
   314 Fed.Appx 59 (9th Cir. 2009) ............................................... 25

*In re Adolor Corp. Sec. Litig.*,
   616 F.Supp.2d 551 (E.D. Pa. 2009) ............................................. 54

*In re Advanta Corp. Sec. Litig.*,
   180 F.3d 525 (3d Cir. 2009) .................................................... 5

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989) ............................................... 51, 56

*In re AstraZeneca Sec. Litig.*,
   559 F.Supp.2d 453 (S.D.N.Y. 2008) .................................... 22, 32, 56

*In re Bare Escentuals, Inc. Sec. Litig.*,
   745 F.Supp.2d 1052 (N.D. Cal. 2010) .................................... 23, 49

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F.Supp.2d 549 (S.D.N.Y. 2004) ........................................... 48

*In re Copper Mountain Sec. Litig.*,
   311 F.Supp.2d 857 (N.D. Cal. 2004) ........................................... 47

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................. 55

*In re Gilead Sciences Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ................................................. 24

v

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*In re Immune Response Sec. Litig.,*
375 F.Supp.2d 983 (S.D. Cal. 2005) ........................................................ 28

*In re Infonet Servs. Corp. Sec. Litig.,*
310 F.Supp.2d 1080 (C.D. Cal. 2003) ...................................................... 50

*In re Netflix, Inc. Sec. Litig.,* No. C 04-2978-FMS
2005 WL 1562858 (N.D. Cal. June 28, 2005) .......................................... 47

*In re Nuvelo Inc. Sec. Litig.,*
668 F.Supp.2d 1217 (N.D. Cal. 2009) ...................................................... 28

*In re Quintel Entm't Inc. Sec. Litig.,*
72 F.Supp.2d 283 (S.D.N.Y. 1999) .......................................................... 48

*In re Rigel Pharm. Sec. Litig.,*
697 F.3d 869 (9th Cir. 2012) .......................................................... *passim*

*In re Rockefeller Ctr. Props. Inc. Sec. Litig.,*
311 F.3d 198 (3rd Cir. 2002) .................................................................... 19

*In re Silicon Graphics, Inc. Sec. Litig.,*
183 F.3d 970 (9th Cir. 1999) ............................................................ 19, 58

*In re Vantive Corp. Sec. Litig.,*
283 F.3d 1079 (9th Cir. 2002) .................................................................. 60

*In re VeriFone Holdings, Inc. Sec. Litig,*
704 F.3d 694 (9th Cir. 2012) .................................................................... 52

*In re Wachovia Equity Sec. Litig.,*
753 F.Supp.2d 326 (S.D.N.Y. 2011) .................................................. 54, 55

*Johnson v. Riverside Healthcare Sys., LP,*
534 F.3d 1116 (9th Cir. 2008) .................................................................. 17

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001) .................................................................... 18

# TABLE OF AUTHORITIES
(Continued)

**Page(s)**

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ............................................. 58, 59

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S.Ct. 1309 (2011) ........................................................... *passim*

*Metzler Inv. GmbH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ...................................... 57, 58, 60

*No. 84 Employer-Teamster Joint Counsel Pension Trust Fund v.*
    *America West Holding Corp.,* 320 F.3d 920 (9th Cir. 2003) .............. 18, 24

*Noble Asset Management v. Allos Therapeutics,*
    No. CIVA-04CV-1030-RPM,
    2005 WL 4161977 (D. Colo. Oct. 20, 2005) .............................. 49

*Padnes v. Scios Nova Inc.*, No. C 95-1693 MHP
    1996 WL 539711 (N.D. Cal. Sept. 18, 1996) ................................ 31, 34, 38

*Philco Invs. LTD v. Martin*,
    2011 WL 500694 (N.D. Cal. Feb. 9, 2011) .................................. 38, 41, 48

*Plevy v. Haggerty*,
    38 F.Supp.2d 816 (C.D. Cal. 1998) ........................................... 57

*Police Retirement Sys. of St. Louis v. Intuitive Surgical*, *Inc.*
    No. 10-CV-03451-LHK*,*
    2011 WL 3501733 (N.D. Cal. Aug. 10, 2011) .................................. 40, 48

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ............................................. 20, 54

*Sanders v. Brown*,
    504 F.3d 903 (9th Cir. 2007) ...................................................... 16

*Scandlon v. Blue Coat Sys., Inc.*, No. C 11-4293-RS
    2013 WL 308879 (N.D. Cal. Jan. 25, 2013) .............................. 26

vii

**TABLE OF AUTHORITIES**

(Continued)

<u>**Page(s)**</u>

*Shemian v. Research In Motion Ltd.*, No. 11 Civ. 4068 (RJS),
    2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013)......................................55, 58

*Skilstaf, Inc. v. CVS Caremark Corp.*,
    669 F.3d 1005 (9th Cir. 2012) ....................................................... 20

*South Ferry LP, # 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................ 56

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ..................................................................... 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...........................................................*passim*

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .......................................................... 28

*Wenger v. Lumisys, Inc.*,
    2 F.Supp.2d 1231 (N.D. Cal. 1998)............................................... 48

*Wietschner v. Monterey Pasta Co.*,
    294 F.Supp.2d 1102 (N.D. Cal. 2003)........................................... 57

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,*
    655 F.3d 1039 (9th Cir. 2011) ...................................................... 18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ....................................... 16, 18, 52, 59

**STATUTES**

15 U.S.C. § 78u-4(b)(1)-(3)............................................................... 18, 19

15 U.S.C. § 78u-5(c)(1)(B)................................................................. 50

15 U.S.C. § 78u-5(i)(1)(B) ................................................................. 49

15 U.S.C. § 78j(b)............................................................................... 6

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

15 U.S.C. § 78t(a) ............................................................... 6

15 U.S.C. § 78t(b) ............................................................... 6

**STATUES, RULES AND REGULATIONS**

17 C.F.R. § 240.10b-5 ......................................................... 6

21 C.F.R. § 14.160 .............................................................. 9

21 C.F.R. § 14.171 .............................................................. 9

21 C.F.R. § 314.2 ................................................................ 9

21 C.F.R. § 314.101 ............................................................ 9

21 C.F.R. § 314.105 ............................................................ 9

Fed. R. Civ. P. 8 ........................................................... 17, 18

Fed. R. Civ. P. 9(b) ....................................................... 26, 29

**OTHER AUTHORITIES**

H.R. Rep. Conf. No. 104–369 (1995) .................................. 5

Plaintiff-Appellant seeks to reverse the District Court's dismissal of his class action complaint asserting claims under the Securities Exchange Act of 1934.  Because Plaintiff's Second Amended Class Action Complaint ("Complaint") fails to satisfy applicable heightened pleading requirements, the District Court's decision should be affirmed.

## INTRODUCTION

Plaintiff alleges generally that defendants-appellees VIVUS, Inc. ("VIVUS"), its Chief Executive Officer Leland F. Wilson, and its Vice President of Clinical Development Wesley W. Day, Ph.D. (collectively, "Defendants") made false or misleading statements about clinical trial results and future prospects of VIVUS's then-developmental weight-loss drug Qnexa between September 9, 2009 and July 15, 2010.  In a close vote, a U.S. Food and Drug Administration ("FDA") Endocrinologic and Metabolic Advisory Committee (the "Advisory Committee" or "Committee") recommended against FDA approval of Qnexa, despite the drug's acknowledged efficacy.[1]  Working backward from this result, suggesting that any safety question raised by a Committee member during the hearing constituted a problem that Defendants had *known* rendered Qnexa not

---

[1]  After longer-term safety data confirmed the trial results considered in July 2010, the Committee voted overwhelmingly to recommend approval.  FDA approved Qnexa in July 2012, and it is currently marketed under the brand name Qsymia™.

approvable, Plaintiff attempts to transform Defendants' accurate reports of clinical trial results and stated optimism about Qnexa into a securities fraud. His effort fails.

The touchstone of a Section 10(b) violation is a false or misleading statement. As the District Court properly held, Plaintiff fails to allege one. Ignoring court directives upon dismissal of an earlier pleading, Plaintiff's Complaint again consists of lengthy quotations from VIVUS's public statements during the class period followed by a selection from 20 supposed "reasons" – cribbed from Committee member comments adverse to approval – why VIVUS's disclosures all were supposedly false. But contrary to the authorities Plaintiff invokes, this is not a notice-pleading case, and after-the-fact questions are insufficient to allege that a public statement was false when made. While Plaintiff is long on innuendo and conclusion, he offers no specific *factual information* that plausibly suggests material falsehood. The heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") mandate dismissal.

Plaintiff says that VIVUS's disclosure of top-line safety data reporting severe and moderate adverse events during the trials and expressing enthusiasm about the results was misleading because other, less-serious events were omitted. He urges reversal on this basis without even citing this

2

Court's recent decision in *In re Rigel Pharm. Sec. Litig.*, 697 F.3d 869 (9th
Cir. 2012), which made clear that the disclosure obligation Plaintiff posits
simply does not exist.

Even if *Rigel* were not controlling, Plaintiff's argument is implausible
for at least the following reasons:  *First*, while Plaintiff says that the "truth"
about Qnexa only emerged at the July 15, 2010 Advisory Committee
meeting, the FDA made its full analysis of Qnexa public two days earlier,
and VIVUS's stock price *rose dramatically* on the release.  The only *new*
fact on July 15 was the actual Committee vote.  *Second*, while Plaintiff says
Defendants' stated enthusiasm about Qnexa's prospects was fraud – *i.e.*, that
it was so lacking in basis as to be deliberately reckless – Plaintiff nowhere
explains how this assertion squares with a substantial minority of the
Advisory Committee *agreeing* with Defendants' clinical assessment and
voting to recommend approval.  *Third,* as the District Court repeatedly noted,
Plaintiff does not claim that VIVUS inaccurately reported its trial results.
Yet he fails to identify any specific trial data or other *fact* – as opposed to a
Committee member or analyst statement – that shows any Defendant
statement was false or misleading when made; nothing on July 15, 2010
reflected a previously undisclosed safety issue that was either clinically

3

significant or inconsistent with the known safety profiles of Qnexa's long-approved constituent drugs.

Moreover, Plaintiff's pervasive suggestion that Defendants concealed the risks associated with Qnexa and investing in VIVUS is belied by the disclosure record before this Court. At every turn, Defendants tempered their public statements with extensive risk disclosures, including specific cautions that the FDA might delay or deny Qnexa approval. Virtually all of the safety "concerns" that Plaintiff says Defendants hid were also disclosed – despite the fact that, as even Plaintiff concedes, the trial data showed many of these concerns to be merely hypothetical, not actual, issues.

Even if Plaintiff could plead falsity, his claim would founder because he fails to allege scienter with any hint of the specificity required. Far from presenting a cogent and compelling portrait of deceit, Plaintiff offers none of the usual indicia of scienter, and his empty "confidential witness" allegations come from people who were in no position to know critical facts anyway. Nothing in the Complaint undermines Defendants' stated belief in, and enthusiasm for, the prospects of VIVUS and Qnexa. There was no intent to mislead, and no reasonable investor could have been misled.

In sum, this case is an archetype of what the PSLRA was enacted to prevent. Congress sought to check hindsight-based actions filed reflexively

4

after negative news, accusing fraud and imposing huge burdens on defendants based on mere assertion that the information had been known all along. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 (3d Cir. 2009) (discussing PSLRA's purpose). Congress directed courts to screen these cases at the outset to ensure defendants are only subjected to these burdens where there is a genuine reason, based on *facts*, to believe a fraud may have occurred. *See, e.g.*, H.R. Rep. Conf. No. 104–369, at 32–41 (1995). Plaintiff's Complaint falls far short of the high PSLRA standards, as the District Court's reasoned opinion details. ER1-33. The judgment should be affirmed.

## STATEMENT OF THE ISSUES

1.     Did the District Court properly conclude that Plaintiff failed to satisfy the PSLRA's requirements for pleading material falsity where:

     a.    Defendants disclosed the risks of investing in VIVUS, including the very matters about which Plaintiff complains;

     b.    VIVUS's stock price increased significantly when the FDA released its independent analysis of the trial data;

     c.    A substantial minority of the FDA Advisory Committee voted to recommend approval of Qnexa;

     d.    Defendants' initial safety-related disclosures from the trials accurately reported severe and moderate adverse events, although they did not also report every other mild event; and

     e.    Plaintiff does not allege that Defendants misreported Qnexa's clinical trial results?

5

2.      Did the District Court properly conclude that Defendants' statements of general optimism were not actionable?

3.      Did the District Court properly conclude that Defendants' forward-looking statements regarding Qnexa's prospects for FDA approval and marketability were protected under the PSLRA's safe harbors?

4.      Did the District Court properly conclude that Plaintiff failed to allege specific facts giving rise to a strong, cogent and compelling inference that Defendants did not genuinely believe their stated assessment of the trial data or otherwise acted with scienter?

5.      Did the District Court abuse its discretion in denying leave to amend the Complaint where Plaintiff had failed to remedy the defects identified when the court dismissed his prior pleading?

## STATEMENT OF THE CASE

### I.      Nature of the Case

This is a putative securities fraud class action asserting claims under Sections 10(b), 20(a) and 20(b) of the Exchange Act.  15 U.S.C. §§ 78j(b), 78t(a), (b); *see* 17 C.F.R. § 240.10b-5.  Plaintiff alleges false and misleading statements about the results of clinical trials of VIVUS's drug candidate Qnexa in certain press releases, investor presentations and other public

6

disclosures.  Plaintiff seeks unspecified damages for persons who acquired
VIVUS securities between September 9, 2009 and July 15, 2010.  ER101 ¶1.

## II.     Course of Proceedings and Disposition Below

This action was filed on November 2, 2010.  Dkt. 1.  Plaintiff
subsequently filed an amended complaint in April 2011.  Dkt. 25.  In it, he
offered pages of block quotations from a set of public statements by
Defendants, each followed by an identical list of 11 supposed reasons why
the quoted disclosures were false or misleading.  *Id.*  The District Court
dismissed the pleading with leave to amend on October 13, 2011 (ER71-73),
holding that Plaintiff's "style of pleading makes it impossible for me to
determine what the false and misleading statements are" and why.  ER95-96.
Plaintiff filed the Complaint on November 9, 2011.  Dkt. 41.

On Defendants' motion, the District Court dismissed the Complaint
with prejudice on September 27, 2012.  ER31-33.  Although Plaintiff grew
his list of "reasons" each Defendant statement was supposedly misleading to
20 (ER10), and added some 100 pages to the Complaint, Plaintiff's pleading
approach was substantively unchanged.  ER11 n.2.  The District Court held
that Plaintiff failed to allege facts that showed that any Defendant statement
was false when made.  ER11, 19.  It also ruled that Plaintiff's allegations
failed to show that any purportedly omitted information was material (ER21),

7

and that, viewed collectively, Plaintiff's allegations did not support a cogent and compelling inference of scienter. ER32. The District Court held that, because Plaintiff had already had the opportunity to amend, further amendment would be futile. ER33. Judgment was entered on September 27, 2012, and Plaintiff filed his Notice of Appeal on October 26, 2012. ER287-92.

## STATEMENT OF FACTS

VIVUS's lead product in clinical development during the relevant period was Qnexa, an obesity treatment. ER101 ¶4. Qnexa is a proprietary combination of two medications long approved by the FDA – phentermine (also known under the brand name Adipex-P), a weight-loss drug, and topiramate (also known as Topamax), used to treat epilepsy and migraine headaches. ER113 ¶44. Topiramate in particular has a history of dose-limiting side effects, but both have well-documented safety profiles, developed through decades of experience with millions of patients. *Id.*; Supplemental Excerpts of Record ("SER") 29. Both drugs' approved dosing levels as monotherapies are higher than amounts used in any Qnexa formulation. SER29.

Drug candidates like Qnexa must undergo a rigorous process of clinical testing and trials before a company may seek FDA approval for sale

8

through a New Drug Application ("NDA").  ER110 ¶39.  The process is intended to ensure that drugs approved for sale are both effective and safe. 21 C.F.R. § 314.2.  After an NDA filing, the FDA makes "a threshold determination that the application is sufficiently complete to permit a substantive review" (21 C.F.R. § 314.101), based in part on its scientific judgment as to "the kind and quantity of data and information an applicant is required to provide for a particular drug to meet the statutory standards."  21 C.F.R. § 314.105.  The FDA may convene an "advisory committee" of scientific experts to consider whether a drug's health benefits outweigh its risks, and issue a recommendation.  21 C.F.R. §§ 14.160, 14.171.  As Plaintiff concedes, the studies, data submissions and analyses required to secure FDA approval are lengthy and expensive.  ER110 ¶39 (average 12 years and $700 million).  The process is also inherently risky.  *Id*. (one in 1,000 compounds tested in laboratory reaches human testing; only 8% of drugs entering Phase I clinical trials receive FDA approval).

## I.      Statements About Qnexa and the Clinical Trial Results

As the alleged class period began, VIVUS had completed certain Phase III clinical trials of Qnexa ("Phase 3 trials") involving more than 4500 overweight and obese adults.  ER112 ¶43.  These randomized, double-blind, placebo-controlled studies included two of three Qnexa dose levels: full-,

9

mid- or low-dose. *Id.*; SER8. Two trials were conducted under an FDA Special Protocol Assessment ("SPA"), meaning that the trials' design, clinical endpoints and proposed analyses were vetted with the FDA in advance and the agency considered them acceptable to support approval. SER13, 20, 30. On September 9, 2009, the start of the class period, VIVUS issued a press release announcing key results of its year-long trials: (a) obese patients on the top dose of Qnexa averaged 14.7% weight loss, with significant improvements in associated co-morbidities; (b) the results exceeded FDA efficacy benchmarks; and (c) Qnexa demonstrated a favorable safety profile. ER117 ¶54; SER7. In December 2009, VIVUS submitted an NDA supported by these results to have Qnexa approved as an obesity drug. ER102 ¶7. On March 1, 2010, FDA accepted the NDA and agreed to review Qnexa. *Id.* Thereafter, FDA evaluated the NDA and convened an advisory committee. *Id.* ¶8.

Between release of top-line Phase 3 trial results on September 9, 2009 and the Advisory Committee meeting the following July, VIVUS made various public statements about the trial results and Qnexa's prospects for FDA approval and marketability. ER117-238 ¶¶54-203. These statements were made into a securities market that recognized the high risk of drug development, particularly given that, as Plaintiff alleges, "[I]n recent years,

10

the FDA has been raising the bar for new drug approvals," with intense scrutiny of weight-loss drugs. ER114-115 ¶¶47-48. VIVUS noted these risks in each public statement, and provided detailed risk disclosures in its periodic SEC filings, including the risks that Qnexa would not be recommended for approval or approved, or that additional and more extensive trials might be required. *E.g.*, SER116-170. As Plaintiff acknowledges, market analysts also noted these risks. *E.g.* ER266 ¶272 (quoting analyst report). VIVUS stock traded in an efficient market that "rapidly absorbed all publicly material information regarding Vivus," and reflected that information, including the disclosed risks and known safety profiles of Qnexa's components, in VIVUS's stock price. ER109-110 ¶¶34-35.

## II.    Briefing Document Disclosures and Later Committee Meeting and Vote

On July 13, 2010, two days before the Advisory Committee meeting, the FDA publicly released both VIVUS's briefing document and its own analysis of the Phase 3 trial data. ER239 ¶205. Market watchers (but not VIVUS) reacted, stating that the FDA response was "benign" and "suggests that safety concerns won't stall approval for Qnexa." SER47. Following the release, VIVUS's stock price climbed 17% on July 13, 2010, its largest one-day increase since VIVUS released its top-line trial results on September 9,

11

2009.  SER93-98.

The Advisory Committee met publicly on July 15, and heard from both VIVUS and FDA reviewers on Qnexa's safety and efficacy.  ER239 ¶204; SER49-92.  VIVUS presented experts who opined that the studies showed Qnexa to be beneficial and effective, and that observed side effects were consistent with those associated with Qnexa's FDA-approved components and should not preclude approval.  *See* SER52-61.  The FDA did not dispute efficacy.  ER240 ¶207.  However, the FDA staff presenter and some Committee members raised questions about long-term safety that some felt were not ruled out by the single year of trial data.  ER243-250 ¶¶215-30.  By a 10-6 vote, the Committee said that "based on the current available data" it did not believe that the "overall benefit-risk assessment of Qnexa is favorable to support its approval."  *See* ER240 ¶207; SER66.  After the vote, VIVUS's stock price fell.

### III.    Plaintiff's Fraud Allegations

The Complaint alleges that, between the September 9, 2009 release of top-line Phase 3 trial results and the Advisory Committee vote on July 15, 2010, Defendants made statements about Qnexa's safety and its potential for FDA approval, while understating the associated health risks.  *See* ER102, 117-238 ¶¶5, 54-203.  Plaintiff says the "truth" about Qnexa was revealed

only at the Committee meeting (ignoring the FDA release two days before). ER103, 239 ¶¶12, 204; *cf.* SER49-92. To support his claim, Plaintiff refers to certain Defendant statements that either accurately described Qnexa clinical trial results or made the point – backed up by VIVUS's NDA filing and its expenditure of resources to advance it – that Defendants believed Qnexa was safe.

As to scienter, Plaintiff selectively quotes the most unfavorable statements by Committee members and asserts Defendants "must have" held those same concerns all along (disregarding the contrary views of a substantial Committee minority). ER258 ¶249. Plaintiff also notes a stock issuance by VIVUS and stock sales by both Mr. Wilson and non-defendant Guy Marsh that Plaintiff acknowledges were pursuant to Rule 10b5-1 trading plans adopted six months before the class period. *Id.* ER268, 272-273 ¶¶276, 292-96. Plaintiff alleges no stock sales by Dr. Day.

**IV.    Subsequent FDA Panel Vote and Approval of Qnexa**

In its Complete Response Letter ("CRL") to VIVUS on October 28, 2010, the FDA asked VIVUS to submit the results of a year-long continuation trial that had been underway since before the Committee meeting. ER254 ¶239. VIVUS re-submitted its NDA for FDA approval in November 2011. *Id.* ER255 ¶241. In February 2012, the FDA convened a

13

new advisory committee (comprised of many of the same members plus additional experts) to reconsider Qnexa. Just before that committee meeting, FDA again released a briefing memorandum analyzing VIVUS's submission, now including two years of trial data. *See* SER183-186. The agency stated that "[i]n general, safety data from the 52-week extension study, OB-305, was consistent with the safety profile noted in the 1-year safety cohort." SER185; *see also* SER186 (same). On February 22, 2012, the 2012 Committee voted overwhelmingly, 20-2, to recommend Qnexa for FDA approval. SER187-189. The FDA approved Qnexa in July 2012.

## SUMMARY OF ARGUMENT

Plaintiff's Complaint was properly dismissed on multiple grounds. Critically, he failed to adequately allege any false or misleading statement. He asserts deception based on alleged omissions, not affirmative misrepresentations; his core complaint is that VIVUS should have disclosed the detailed Phase 3 trial data eventually submitted with its NDA when it announced summary results during the class period. But the Complaint fails to allege any specific facts showing that the purportedly "omitted" data reflected safety issues that rendered misleading Defendants' stated assessments of Qnexa safety or its potential for FDA approval. Plaintiff's story that threats to VIVUS and Qnexa's success were concealed is

14

undermined by at least (1) VIVUS's extensive risk disclosures throughout the class period, (2) the positive market reaction to the FDA's release of the complete trial data days before the Committee meeting, (3) the well-known safety profiles of Qnexa's long-approved components, and (4) the close Committee vote, including a substantial minority that voted for approval. Plaintiff's story also conflicts with the FDA's later approval of Qnexa on data that confirmed the safety information included in VIVUS's initial NDA. As the District Court stated repeatedly, Plaintiff fails to point to any specific fact in the trial data or otherwise that renders any Defendant statement during the class period false or misleading.

Additionally, Plaintiff's assertions based on Defendant statements that Qnexa's trials showed "remarkable" efficacy and safety or a "compelling" risk/benefit profile, or on predictions about Qnexa's approvability are not actionable. Statements of general optimism cannot support a fraud claim, and forward-looking statements accompanied by meaningful cautionary language are protected by the PSLRA's safe harbors.

The Complaint also fails to allege a strong, cogent and compelling inference of scienter. The far more compelling inference to be drawn from the facts alleged and in the record, whether analyzed separately or collectively, is that Defendants genuinely believed their disclosures about

15

Qnexa's Phase 3 trial results and the drug's prospects. Defendants acted consistently with that stated belief, not with intent to mislead or defraud anyone.

Plaintiff's claims for violations of Sections 20(a) and 20(b) of the Exchange Act are deficient because those claims require a primary violation under Section 10(b), and none has been pled.

Finally, as Plaintiff already had an opportunity to amend and largely ignored the District Court's directives as to what he needed to show to avoid another dismissal, leave to amend was properly denied.

## ARGUMENT

### I.     STANDARD OF REVIEW

Defendants agree that rulings on motions to dismiss are reviewed *de novo*. Dismissal may be affirmed on any proper ground supported by the record. *See Foster v. Wilson*, 504 F.3d 1046, 1050 (9th Cir. 2007). Conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

Defendants also concur that denial of leave to amend is reviewed for abuse of discretion. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009).

16

Notwithstanding their agreement on the standard of this Court's review, Defendants disagree with Plaintiff's characterizations of the legal standards applicable to his claims, as described below.

## II.   PLAINTIFF MISSTATES THE APPLICABLE LEGAL STANDARDS

To state a Section 10(b) claim, a plaintiff must allege: (1) a material misrepresentation or omission by defendant; (2) scienter; (3) a connection between the misstatement and the purchase or sale of a security; (4) reliance upon the misstatement; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). The material falsity and scienter elements are the focus here.

Despite clear law governing pleading standards applicable to securities actions, Plaintiff invokes, and asks this Court to apply, notice-pleading standards at odds with the PSLRA. Appellant's Opening Brief ("AOB") at 27.[2] Even under Rule 8, a plaintiff cannot rest on conclusory assertions of falsity, nor on allegations based on unwarranted deductions or unreasonable inferences that contradict materials properly subject to judicial

---

[2]  Plaintiff's pleading-standard discussion omits PSLRA cases in favor of notice-pleading cases from other contexts. *E.g.*, AOB20 (citing *Johnson v. Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1122 (9th Cir. 2008) (regarding civil rights/hostile work environment claims)); AOB27 (citing *Cardenas v. NBTY, Inc.*, 870 F.Supp.2d 984, 989 (E.D. Cal. 2012) (discussing Rule 8 standards in consumer protection case)).

notice. *Iqbal*, 556 U.S. at 678-79; *Clegg v. Cult Awareness Network*, 18

F.3d 752, 754-55 (9th Cir. 1994). Contrary to Plaintiff's assertion here and

to the District Court (*see* ER40, 82), Rule 8 does not control the falsity

element of his claims. *See* 15 U.S.C. § 78u-4(b)(1) (PLSRA standard for

pleading falsity). Under the PSRLA, plaintiffs must plead falsity *with*

*particularity*, meaning they must come forward with *specific facts* making

clear what they allege to be misleading, the reasons why, and "all facts" on

which that belief is based. *Id.; see, e.g.*, *WPP Luxembourg Gamma Three*

*Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1047 (9th Cir. 2011); *Zucco*, 552

F.3d at 990.[3] As Plaintiff's claim is based on omissions, he must establish

that Defendants were under a duty to disclose the information, *Matrixx*

*Initiatives, Inc. v. Siracusano,* 131 S.Ct. 1309, 1321 (2011); and that the

failure to do so was misleading. *Brody v. Transitional Hosp. Corp.,* 280

---

[3] While review on a motion to dismiss is generally limited to the contents of
the complaint, courts also consider documents referenced in the complaint
and those on which plaintiff's claims are based, *e.g., No. 84 Employer-*
*Teamster Joint Counsel Pension Trust Fund v. America West Holding Corp.,*
320 F.3d 920, 925 n.2 (9th Cir. 2003), as well as matters properly subject to
judicial notice, *Lee v. City of Los Angeles,* 250 F.3d 668 (9th Cir. 2001). *See*
*also* ER6-7. Defendants requested judicial notice of all materials in the
SER, which generally contains VIVUS press releases, excerpts from Forms
10-K and 10-Q filed with the SEC, and excerpted briefing documents for,
and the transcript of, the Advisory Committee meeting. Dkt. 46. While the
District Court did not expressly rule on that request, it based its holdings on
"the judicially noticeable documents" (ER14) and specifically referred to
many of the documents in the SER (*see id.* (Advisory Committee record);
ER28 (SEC filings)).

18

F.3d 997, 1006 (9th Cir. 2002). To be misleading, an omission must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*

With the PSLRA, Congress required courts to probe a securities complaint and the materials it cites (or that may otherwise properly be noticed) to assess whether the pleading supports, with facts, assertions that fraud may actually have occurred. 15 U.S.C. § 78u-4(b)(1)-(3). If that support is lacking, the complaint must be dismissed.[4]

With respect to scienter, Plaintiff must allege *facts* that support a strong inference that Defendants acted with at least "deliberate recklessness." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 974, 988 (9th Cir. 1999). Overall, the allegations must support a "cogent and compelling" inference of scienter that is at least as compelling as alternative benign inferences that can be drawn from the record. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).

---

[4] Plaintiff urges the Court to ignore the record and draw all inferences in his favor based on unsupported conclusions. *E.g.,* AOB21, 27. But in securities cases, unless plaintiff has alleged facts with the requisite particularity, he "may not benefit from inferences flowing from vague or unspecific allegations" even if such inferences might be permissible under a traditional pleading analysis. *In re Rockefeller Ctr. Props. Inc. Sec. Litig.*, 311 F.3d 198, 224 (3rd Cir. 2002).

Plaintiff says that competing innocent inferences "must be derived solely from the four corners of the complaint." AOB18. But controlling authority is clear that such inferences may be supported by materials properly the subject of judicial notice (*e.g.*, *Tellabs*, 551 U.S. at 322; *see also Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1016 n.9 (9th Cir. 2012)). Plaintiff's fraud narrative depends on a disregard of the factual record; but the law permits the Court to look beyond his selected, decontextualized morsels.

## III.   PLAINTIFF FAILS TO ALLEGE ANY MATERIALLY FALSE OR MISLEADING STATEMENTS

The gravamen of a securities fraud claim is a defendant statement that was false or misleading when made. *See Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001). Plaintiff's Complaint fails because he simply does not allege one.

### A.   Defendants Disclosed the Risks Plaintiff Says Were Hidden

Reading Plaintiff's brief, one might assume that Defendants never told investors that VIVUS was a highly risky venture; that Qnexa had the potential for serious side effects; or that FDA approval was uncertain. In reality, far from practicing the unrestrained boosterism that Plaintiff suggests, VIVUS's disclosures show Defendants were consistently candid about the many risks to Qnexa's approval and marketability, and discussed

20

virtually every matter that Plaintiff now complains Defendants hid.  *E.g.*,
SER116-174.

For example, Plaintiff claims that because phentermine was in Fen-Phen, a weight loss drug pulled from the market because of heart-valve issues associated with that drug's *other* constituent (fenfluramine), Qnexa was under an undisclosed cloud that rendered approval impossible.  *See* AOB35; *see also id.* at 8, 20, 28.  But what Plaintiff terms the "unspoken specter" of Fen-Phen *was* spoken of, forthrightly and repeatedly; VIVUS's public filings included specific disclosures of this risk that concluded: "Association with fen-phen could lead to increased scrutiny of our investigational product candidate, Qnexa."  SER118, 127.  Plaintiff also says Defendants hid risks associated with combination therapies.  AOB28. Again, not so; this was also disclosed in every VIVUS SEC filing.  *E.g.*, SER131 ("[Regulators] will likely require more extensive or expensive trials for our combination investigational product candidate, Qnexa, than may be required for single agent pharmaceuticals.").

The same is true of nearly every other category of risk that Plaintiff complains about – from potential difficulties or delays with FDA approval, *see* AOB19, 29; *compare* SER122-127, 131, 133-135, to the side-effect profiles of Qnexa's components and their potential to result in labeling

21

restrictions or other marketing issues, *see* AOB8, 28, 36; *compare* SER127-129, 135-137. The side effects called out in the risk disclosures included the potential for adverse psychiatric, cognitive, or cardiovascular side effects. SER127-128. As to Plaintiff's complaint about the possibility of a pregnancy Category X restriction, (AOB15-16), investors had been told all along that Qnexa was counter-indicated for women who were or planned to become pregnant. SER129.

VIVUS's public filings, with page after page of specific risk disclosures, negates Plaintiff's suggestion that the issues raised by some Committee members and the possibility of the Committee's negative vote were hidden from investors. And as we discuss in Part III.F below, the disclosures also constitute the cautionary language that renders Plaintiff's claims based on forward-looking statements non-actionable.

**B.     The Market Reaction Supports Defendants' Statements**

Plaintiff's story that the "truth" about Qnexa only emerged at the Committee's July 15, 2010 meeting (AOB11) suffers from another major infirmity: it ignores the undisputed fact that the FDA publicly released briefing documents, with extensive trial data and the FDA's analysis of potential safety issues, on July 13, two days *before* the Committee meeting and vote. ER103 ¶12 n.2 (citing July 13 article). In response to the 307-

22

page briefing from VIVUS and 248-page FDA analysis memorandum (the "FDA Memo"), VIVUS's stock price *increased* 17% – its largest gain since September 9, 2009, when VIVUS first released Phase 3 trial data. *See* SER93-98; *compare In re AstraZeneca Sec. Litig.*, 559 F.Supp.2d 453, 462-63 (S.D.N.Y. 2008) (Plaintiff's (unsuccessful) fraud claims based, in part, on stock price *drop* after FDA briefing documents were released before FDA meeting). The market, awaiting this information, understood that the data confirmed, rather than contradicted, what VIVUS had previously said; and investors voted their dollars accordingly. This fact is fatal to Plaintiff's claims. Not surprisingly, his attempt to square it with his imagined story of fraud conflicts with his own allegations and the record.

Plaintiff hypothesizes that "investors needed the expert guidance from the panel to fully comprehend the import of the voluminous safety data." AOB41. This directly contravenes Plaintiff's allegation of an efficient market for VIVUS securities. ER109 ¶¶34-35. Indeed, Plaintiff's invocation of a "fraud-on-the-market" theory of reliance rests entirely on these market-efficiency allegations. *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F.Supp.2d 1052, 1074 (N.D. Cal. 2010).

Plaintiff cannot have it both ways, at once alleging that "the market for Vivus securities *rapidly absorbed all publicly material information*

23

regarding Vivus and that information was reflected in the price of Vivus securities" (ER109 ¶35), but then claiming that "the market took two days and the analysis of experts" to process the trial data because the two public briefing documents (with exhibits) ran 555 pages. AOB41. The speculation that the market was unable digest the trial data without the Committee's input is unsupported by any factual allegation.[5] The theory is particularly far-fetched where, as the District Court noted, all of the safety "revelations" upon which his fraud theory appears to rely – "double rate of depression," "four times as many cognitive adverse effects," "increased heart rate" and so forth – can be found within the *first seven pages* of the FDA Memo. ER21.[6]

Furthermore, Plaintiff's theory conflicts with *what actually happened*. Had the market not absorbed the analysis for days, VIVUS's stock price

---

[5] Plaintiff's reliance on *Gilead* and *America West* is misplaced. AOB41. In those cases, the share-price decline was delayed either by later revelation of previously undisclosed information or by a continuing misrepresentation. *See In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1054 (9th Cir. 2008) (impact of off-label marketing and FDA Warning Letter about it revealed only later, when Gilead released quarterly financial results showing disappointing sales of the drug); *America West*, 320 F.3d at 935 (price response delayed because airline continued to reassure analysts that compliance with the subject settlement agreement would have no noticeable financial impact). Nothing analogous is alleged here.

[6] Plaintiff discounts the FDA's introductory summary of its own memo as "insufficient" to accelerate the purportedly delayed digestion of the data analyzed. AOB42. Yet Plaintiff has no difficulty relying on the five-page "Summary Minutes" of the Advisory Committee as a proxy for a full day's deliberation by 16 experts with widely divergent positions, the transcript of which was more than 370 pages. SER49-92.

24

would have been unresponsive to its release.  But in fact the stock responded immediately (and positively), just as the Plaintiff-invoked fraud-on-the-market theory predicts.  *E.g.*, *Huberman v. Tag-It Pac. Inc.*, 314 Fed.Appx. 59, 63 (9th Cir. 2009), *citing Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999).  The July 13 FDA release and price reaction contradict Plaintiff's assertion that "[t]he deception finally unraveled on July 15, 2010" (AOB11) and negate Plaintiff's assertion that VIVUS's statements about Qnexa's prospects from earlier in the class period were false or misleading.[7]

### C.    The Court Considered Plaintiff's "Theory of the Case" and Found It Implausible and Unsupported by Alleged Facts.

In characteristically loose treatment of the record, Plaintiff claims the District Court "insisted that Plaintiff's 'entire theory of the case is that [D]efendants misled investors by saying they expected Qnexa to be approved by the FDA.'"  AOB23 (citing ER19).  What the District Court actually said is that "it is undeniable that *one major theme* that underlies Plaintiff's entire theory of the case is…"  Plaintiff's misquotation

---

[7]  In his Statement of Issues, Plaintiff contends the District Court ruled on disputed questions of fact.  But his only argument on the point appears to be that the District Court *implicitly* ruled on a "truth-on-the-market" defense invoked by neither Defendants nor the court.  AOB21, 42.  He then attacks his straw man as out-of-place at the pleadings stage.  Defendants are not arguing, as they would under that doctrine, that a concededly false statement was neutralized by accurate information in the market.  The argument is that Plaintiff has not pled a materially false statement.  And the District Court agreed.

25

notwithstanding, the District Court did not miss, or disregard, his theory of the case – hardly a novel one in the context of securities claims against drug companies. The Court simply found that Plaintiff failed to point to a statement by Defendants about the Qnexa trials and explain what in the trial data or elsewhere rendered that statement false or misleading. ER11. Plaintiff's Complaint allows no alternative reading. There are no facts – not after-the-fact concerns or opinions from some Advisory Committee members, but *specific alleged facts* required by the PSLRA and Rule 9(b) – showing that Defendants' statements about Qnexa data, or about their beliefs in the drug's prospects, were false or misleading when made. Authority relied upon by Plaintiff makes clear that "plaintiff's theory does not excuse it from pleading with sufficient specificity and clarity demonstrably false assertions of fact and/or material omissions of information as to which a duty to disclose existed." *Scandlon v. Blue Coat Sys., Inc.*, 2013 WL 308879, at *3 (N.D. Cal. Jan. 25, 2013) (dismissing complaint).

Plaintiff asserts that the "crux" of his allegations is that Defendants focused on some trial results and expressed positive statements about them, while omitting additional data that, "if accurately and prominently revealed," would have altered investor feelings about Qnexa and its "likelihood and timing of any commercialization." AOB24. Putting aside that Plaintiff's

26

description of his theory is scarcely distinct from the District Court's supposedly inaccurate summary (or that his speculation about how investors would have reacted is wholly unsupported), his theory of omission was *squarely addressed and rejected*. The District Court considered Plaintiff's allegations (ER10) and repeatedly held that no such omission had been pled. ER19, 28, 32. As this Court's recent decision in *Rigel* makes clear, the District Court was plainly correct.

Plaintiff says that Defendants' reports on Qnexa safety were misleadingly incomplete because, despite their admittedly accurate report of observed severe and moderate adverse effects, VIVUS omitted data on milder events. *E.g.*, AOB32 (psychological side effects). But *Rigel* expressly rejects Plaintiff's argument that Defendants were obliged to disclose every piece of data. Instead, *Rigel* held that summaries of trial data suffice, particularly where, as here, the summaries are concededly accurate and Plaintiff alleges no facts to suggest Defendants did not genuinely believe their clinical assessments. 697 F.3d at 880; *see also infra* Part III.D.3.a.

Plaintiff's efforts to equate this case with others actually involving material omissions of negative trial data underscore what is missing from his Complaint. In several cases Plaintiff cites, courts found fraud adequately pled where defendants continued to assure investors of strong trial results

27

when underlying data allegedly known to them revealed no observable difference between outcomes on the drug and placebo arms, and therefore no basis for believing the drugs effective. *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1020 (S.D. Cal. 2005), *In re Nuvelo Inc. Sec. Litig.*, 668 F.Supp.2d 1217, 1222 (N.D. Cal. 2009), and *Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996). That could not be more different from the situation here, where efficacy is unchallenged and Plaintiff focuses on supposed nondisclosure of less severe side effects beyond the accurate top-line safety data that VIVUS released.[8] *See Heywood v. Cell Therapeutics, Inc.*, 2006 WL 5701625, at *6 (W.D. Wash. May 4, 2006) (dismissing case and distinguishing *Immune Response* and cases like it as instances where "defendants either grossly misrepresented some specific material fact, or failed to disclose some concrete indication that they could not expect FDA approval"). Plaintiff does not, and cannot, point to any similarly negative data withheld by Defendants. Again, holding that Plaintiff's "theory" is not supported by facts is not the same as "disregarding" it; the District Court's analysis was sound.

---

[8] Plaintiff misuses an FDA term of art, claiming VIVUS omitted "serious adverse events" from its initial disclosures. AOB26. These were not SAEs; the additional events reflected in VIVUS's complete data were *mild* events, consistent with its earlier release of summary results.

28

**D.    The District Court Drew All Appropriate Inferences In Finding That Plaintiff Failed to Allege Any Materially False or Misleading Statements.**

Plaintiff's assertion that the District Court failed to draw inferences in his favor fares no better.  As explained, it ignores the PSLRA's heightened pleading standard and relies on inapplicable authorities from outside the securities context. *Supra* Part II.  By tying his allegations to selected opinions or conclusions of certain Committee members, Plaintiff alleges only conclusions himself, which would be insufficient even without considering Rule 9(b) and the PSLRA.  Plaintiff's protest that the District Court failed to draw the inferences he wanted, but drew inferences against him (AOB27-39), amounts to no more than a concession that Judge Hamilton did precisely what the PSLRA contemplates:  she examined the record and held that Plaintiff's story was "highly implausible under the facts presented."  ER19.

Plaintiff contends that the District Court failed to draw inferences in his favor as to (1) the Advisory Committee meeting and vote; (2) considerations relating to Qnexa's combination of two known and long-used therapies, and (3) Defendants' statements about specific potential side effects of Qnexa.  As to each, however, Plaintiff's allegations exhibit the

29

same basic defect: he fails to point to any specific fact that renders any Defendant statement false or misleading.

1. <u>The Committee discussion shows a close vote, not fraud.</u>

Plaintiff cites snippets from the Committee meeting as "facts" underpinning his claim; but the meeting record as a whole, including the full debate and the members' difficult voting decisions (and 10-6 outcome), *negates* any inference of fraud. SER67-92; Dkt. 45-7. Member comments reveal that their chief concern was *not* that the data reflected a poor, previously undisclosed safety profile or that the data contradicted earlier disclosures. Rather, some felt there simply were not enough data on long-term use, given that certain side effects with prior weight-loss drugs became apparent only after prolonged use. Anticipating long-term use of Qnexa, Dr. Proschan's comments were typical: "I think if we had had longer follow-up, I probably would have voted [for approval]. But I just don't feel comfortable with one year follow-up." SER75. In bold type, Plaintiff suggests that information about the amount of data gathered and length of the trials "is precisely the information that Plaintiff alleges investors were deprived of." AOB29. But VIVUS did not mislead anyone about the

studies it conducted.[9]  It accurately disclosed its trial design, including that trials supporting its NDA had (to that point) collected one year of results. SER6-11.  Plaintiff does not contend otherwise.

The disclosed trial design was consistent with the FDA's Guidance for Industry, which stated that "weight loss and weight maintenance should be demonstrated over the course of at least 1 year" and that "a reasonable estimation of the safety of a weight-management product upon which to base approval generally can be made … [after] 1 year of treatment."  *See* SER44-45.  Having completed the contemplated year-long trials under an approved SPA, Defendants were justifiably excited.  After all, Qnexa's components were both long-approved medications, the side effects observed in the Phase 3 trials were consistent with the components' safety profiles, and a long-term outcomes trial was already underway.  *See* SER20; SER31-32.  Certain Committee members' call for additional tests or more data is at most an after-the-fact critique of the FDA-approved protocol.  It cannot buoy a claim that VIVUS's statements were knowingly false or misleading when made. *See, e.g. Padnes v. Scios Nova Inc.*, 1996 WL 539711, at *5 (disagreements

---

[9]  Plaintiff's effort to explain away the Committee's failure to find a "definitive" depression signal by asserting that the 4500-person trial was too small (AOB32 n.6) suffers from the same infirmity.  From the beginning, Defendants clearly disclosed their trial designs; Plaintiff's backward-looking effort to parse the trial results cannot support a fraud claim.  *See Rigel*, 697 F.3d at 878; *Padnes*, 1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996).

over study design and interpretation insufficient to allege falsity: "[W]here a company accurately reports the results of a scientific study, it is under no obligation to second-guess the methodology of the study.").  And were there any doubt that Committee concerns focused on assuaging fears about longer-term use rather than on demonstrated safety issues, the overwhelming 2012 Committee vote and FDA approval following a second year of consistent data put it to rest.  SER185.

This is not a case where a bombshell of previously undisclosed data was dropped late in the game, undercutting prior confident statements. Instead, the fact that experts split about 60-40 on approval after poring over the data and a day-long hearing confirms that this was, at worst, reasonable minds interpreting data differently, *not* active deception.[10]  Assessing similar claims against AstraZeneca, that court noted that at its advisory committee meeting, the "[sponsor] had its side of the case and the FDA staff had its side."  In that context, the vote against approval "does not mean that [the sponsor] was not conscientious in advocating the drug [] before the FDA, nor does it mean that the information issued publicly over the course of more than a year was dishonest or recklessly disseminated."  *AstraZeneca*, 559

---

[10]  "[T]o allege falsity, a plaintiff must set forth facts explaining why the difference between two statements is not merely the difference between two permissible judgments, but rather the result of a falsehood." *Rigel*, 697 F.3d at 877 (internal citation omitted).

F.Supp.2d at 471.  The same is true here.

Nothing suggests that those voting *for* approval failed to appreciate some newly disclosed adverse fact; there was none.  These Committee members just came to a different conclusion.  Ms. Coffin said she was "a little surprised" by the "no" votes, adding, "I do believe that the side effects that were listed here were reasonable … I do feel like we're letting perfect get in the way of possible [by voting against approval]."  SER89-90; *see also* SER88 (Dr. Hendricks: VIVUS "did an outstanding job producing the data, and that the data does show … that the drug is reasonably safe and that we should approve it.").  Even those voting against approval, quoted extensively by Plaintiff, were conflicted.  For example, Dr. Cragan commented:  "I voted no, and *I also found it a very difficult decision*.  This drug is clearly effective and has the potential to change many people's lives.  And I really hate to be on record voting against that."  SER90 (emphasis added).  Dr. Burman, to whom the Complaint attributes the list of potential side effects that Plaintiff says renders nearly every Defendant statement false,[11] was far more equivocal than Plaintiff implies: "I voted no, but it's a

---

[11]  Many of the "reasons" Plaintiff repeats to assert falsity are variations on the allegation that "Phase 3 trials *showed significant, potentially serious and life-threatening adverse effects* of the type that scuttled approval for other obesity drugs, including…."  *E.g.*, ER127-132 ¶¶ 57(a)-(e).  The assertion takes great liberties with the record.  What Dr. Burman actually said,

33

no with a lot of explanations. And I agree that the committee seems to be closer than perhaps appears … I wouldn't be upset if it were approved [by the FDA] with a lot of explanation." SER75-76. These and other comments underscore that the negative vote resulted from different people evaluating the data and reaching different judgments, not from concealed facts that contradicted Defendants' public statements. *See, e.g.*, *Padnes*, 1996 WL 539711, at *5; *see also DeMarco v. DepoTech Corp.*, 149 F.Supp.2d 1212, 1225 (S.D. Cal. 2001) ("Although Plaintiffs may have established a legitimate difference in opinion as to the proper statistical analysis, they have hardly stated a securities fraud claim.").[12]

At bottom, Plaintiff offers nothing to explain this basic inconsistency: if the clinical data so plainly contradicted Defendants' statements about Qnexa's approval prospects, how could six Committee experts (and much of the investing public) decide that an approval recommendation should issue

---

weighing against Qnexa's clear efficacy, was: "On the other hand, the medication has serious *potential* adverse effects, including.… Some of these side effects are serious and *could be* life threatening, and they have to be weighed against" the drug's positive factors. SER76 (emphasis added). In other words, these were "*potential*" issues, not side effects that had been "show[n]."

[12] Plaintiff claims that some who voted *for* Qnexa also felt it was a difficult question and did so with reservations. AOB17. But this merely reflects that the vote was close. *See, e.g.*, Dr. Goldfine, SER73 ("I think that in the comments, you're going to hear that the panel was probably closer despite the split vote."). That fact cannot reconcile with Plaintiff's theory – that the data, once revealed, made a negative vote "virtually guaranteed." AOB28.

(or was likely)?  *Cf.* ER253 ¶238 (article calling Committee result a "surprise vote").  Those voting for approval did not miss some land mine in the data; they merely judged it differently.

          2.  <u>Defendants' statements about safety were accurate given the known safety profiles of Qnexa's components.</u>

Plaintiff asserts that the District Court failed to draw inferences about the dangers of combination therapies (AOB28), but pleads no facts to support such inferences; nothing pled suggests the trial data showed any safety issue resulting from Qnexa being combination drug.  In fact, the millions of patient-years of experience with phentermine and topiramate provided context for, and confirmed the accuracy of, Defendants' statements about Qnexa's safety.  As noted, this context was fully disclosed by VIVUS (*see supra* Part II, *e.g.*, SER128, SER173), and it was restated in the Committee briefing materials by VIVUS and the FDA.  *See* SER37 ("The safety and tolerability profile of QNEXA *should be evaluated in the context of the known adverse effects of the component agents*.")(emphasis added); SER102 (areas for safety evaluation "[*b*]*ased on the individual safety profiles of phentermine and topiramate*.") (emphasis added).

Plaintiff quotes Defendants' statements that Qnexa's Phase 3 safety results presented "no issues of concern at this point" or "no surprises."  *See, e.g.*, ER131 ¶57(e), ER156 ¶86(f), ER164 ¶96(c), ER195 ¶126(h).  These

statements were made in the context of the components' known safety profiles, and understood as such. *See, e.g.*, ER143 ¶70 ("[N]othing in here of concern *that we haven't seen in other trials or is not in the label of existing studies*.") (emphasis added); ER209 ¶150 ("Nothing that was unusual, nothing that was exacerbated by the combination." ). Defendants' point was that Qnexa's Phase 3 trials did not present unexpected and/or *previously unknown* safety issues as a result of the drugs' combination. Plaintiff alleges no contrary facts.

Unable to dredge up anything in either the data or Committee member comments to challenge Defendants' stated belief that Qnexa's safety profile was consistent with that of its components, Plaintiff simply invents a "reason" these statements are supposedly misleading, alleging:

> although combination therapy can enhance the safety and/or effectiveness of two drugs, the data from the Phase 3 Trials *showed* significant, potentially serious and life-threatening adverse effects including *potential* teratogenicity, increased suicidal ideation, cognitive issues, decreased bicarb, tachycardia, and possible renal stones, *which meant that the combination of topiramate and phentermine was increasing the risks and magnitude of the side effects found in the individual constituent compounds and/or creating new side effects not seen in the individual compounds*, which is the effect of combining two drugs that should not be combined.

*See* ER176 ¶106(g), ER194-195 ¶¶126(e)(iv) & (g)(iv), ER218 ¶167(c), ER222 ¶174(c), ER225 ¶179(b)(iii) (emphasis added). The first clause of

36

this mantra represents a simple twisting of the record – some Committee members cited these side effects as *potential*, not *shown*. *See supra* n.11. More troubling is the second clause, beginning "which meant…." In this clause, Plaintiff does not bother distorting the record; he simply makes it up without *any* reference to data, Committee member comments, analyst statements or anything else. His sole authority for the point that combination therapies have the *potential* for side effects beyond those associated with the individual components is a 1999 Journal of American Medicine article. ER114 ¶46 n.6. But as the District Court recognized, the article "appears to have no particular relevance to the question of Qnexa's safety." ER12. Plaintiff cannot sustain his Complaint by reliance on invented fantasy inconsistent with undisputed facts in the record.[13]

      3. <u>Defendants' statements about trial results related to specific potential side effects were not false or misleading.</u>

        *(a)* *This Court's decision in* Rigel *rejects that every adverse event be disclosed.*

Even if the safety data reviewed by the Advisory Committee had first become public on July 15, 2010 (rather than two days earlier), the data were

---

[13] Plaintiff's assertion about the combination-therapy issue is reminiscent of hyperbole offered at oral argument below, calling Qnexa "a dangerous drug" where people lose weight "by dying" and praising the Committee for saving the nation from "one of the worst national medical disasters imaginable." ER80. In fact, there was exactly one death among the 4500 Phase 3 trial participants – a person on the *placebo* arm of the study. SER35.

consistent with, not contradictory to, VIVUS's public statements.  VIVUS's decision to focus on moderate and severe adverse events in reporting initial, top-line results is not rendered misleading by a later data release showing additional, less-severe events, as this Court recently held in affirming dismissal of Section 10(b) claims on similar facts.  *See Rigel*, 697 F.3d at 880; *see also Philco Invs. LTD v. Martin*, 2011 WL 500694, at *7-8 (N.D. Cal. Feb. 9, 2011).

In *Rigel*, this Court held that defendants clearly identified their initial statements as "key safety results" and accurately disclosed results within the reported categories of severity; later release of additional data consistent with those results did not render the initial statements misleading.  697 F.3d at 880; *see also Padnes*, 1996 WL 5389711, at *5 ("Defendants, like any other company wishing to publicly discuss the results of a scientific study, had to make a judgment as to which specific bits of information about the study and its conclusions to disclose.").  Likewise, in *Philco*, the court found that release of top-line results from a Phase 2 study was not misleading because it did not disclose all adverse events, even when more details were released later.  2011 WL 500694, at *8, *citing Brody*, 280 F.3d at1007.

As in *Rigel*, *Brody,* and *Philco*, VIVUS repeatedly explained that it was providing summary trial results.  *See, e.g.*, ER190 ¶125; SER20.  As the

38

disclosures quoted in the Complaint make clear, VIVUS said it was providing data on moderate and severe (not *all*) adverse events. *See, e.g.*, ER124 55(e) ("Depression or depressed mood adverse events *of a moderate to severe nature* were less than 2% and were similar among patients in the Qnexa and placebo groups"); ER178 ¶110 ("no difference between Qnexa and placebo for incidence of *moderate or severe* depression/depressed mood (1.7%, 1.7%, 1.2% and 1.9% for placebo, Qnexa low-dose, Qnexa mid-dose and Qnexa full-dose, respectively")) (emphasis added). Under *Rigel*, these statements are not actionable.

Plaintiff's contrary argument misreads the Supreme Court's decision in *Matrixx,* which held adverse events not statistically linked to a drug may still need to be disclosed in some circumstances. 131 S. Ct. 1309. But *Matrixx* explicitly says that this "does not mean that pharmaceutical manufacturers must disclose all reports of adverse events" as that would "bury the shareholders in an avalanche of trivial information." *Id*. at 1318, 1321*; accord Rigel*, 697 F.3d at 881. Yet this is precisely what Plaintiff would oblige VIVUS to do. The logical conclusion of his argument is that a company could never summarize data when disclosing trial results, but must publish in the first instance every shred of raw data from its clinical

studies.[14]  That is not what *Matrixx* requires.  "[I]t is not sufficient for

Plaintiff to allege that statements are merely incomplete," because "[n]o

matter how detailed and accurate disclosure statements are, there are likely

to be additional details that could have been disclosed but were not."  *See*

*Police Ret. Sys. of St. Louis v. Intuitive Surgical*, *Inc.* 2011 WL 3501733, at

*11 (N.D. Cal. Aug. 10, 2011).  *See also Rigel*, 697 F.3d at 880 n.8, 881

n.10 (distinguishing *Matrixx*).

> (b)    *Plaintiff distorts the Advisory Committee record on*
> *particular side effects*

This entire brief could be spent discrediting Plaintiff's scattershot

claims as to specific side effects mentioned at the Committee hearing by

contradicting them with the actual trial data disclosed by Defendants.

Instead, we summarize for illustrative purposes some key errors with

Plaintiff's pleading as to each.

**Psychiatric Results.**  In response to *any* VIVUS statement that

touches on psychiatric safety, (*see, e.g.*, ER122-125 ¶¶55(c)-(e)) or even

general safety and tolerability of Qnexa (*e.g.*, ER125 ¶¶55(f), (g), ER127-

128 ¶¶57(a), (b)), Plaintiff trots out the same selected assertions from the

---

[14]  Even if VIVUS had disclosed all of the raw data, those data were
consistent with what Defendants said from day one of the class period, as the
following discussion, and stock price increase upon release of the full data
on July 13, 2010, confirm.

much-later FDA Memo, Committee member comments, and/or the meeting's summary minutes.  He says Defendants' statements all misled because: (1) patients on Qnexa experienced more total adverse psychiatric events and study discontinuations because of adverse events (including psychiatric events) than those on placebo; and (2) longer-term and/or additional studies were needed to determine whether Qnexa users in fact experienced psychiatric side effects (including depression or suicidal ideation).  *See, e.g.*, ER122-123 ¶55(c)(i)-(vii).  These allegations do not show Defendants' statements were misleading.

Even the Committee members and analysts on whom Plaintiff relies agree that the actual trial data showed no signal for suicidality (*see, e.g.*, Dr. Rogawski at ER249 ¶228) or depression (analyst at ER260 ¶235).  Plaintiff grudgingly acknowledges that no suicidality signal was identified (AOB31), but says the Complaint should be sustained based on speculation about "the possibility" that there "could" be a signal for suicide with further study. Plainly, this does not allege a false statement by Defendants.

As to the other psychological claims:

41

- VIVUS disclosed Phase 3 trial data on *moderate and severe* depression the first day of the class period. SER110. That there were more *total* adverse events (the vast majority being *mild*) in the Qnexa arm versus placebo does not undermine what VIVUS reported. *See Rigel*, 697 F.3d at 880; *Philco*, 2011 WL 500694, at *8.[15]

- VIVUS also disclosed the first day of the class period data showing trial discontinuations based on psychiatric events. *See* SER109 (comparing discontinuation rates between placebo and top-dose Qnexa for insomnia (0.4% to 1.7%) depression (0.2% to 1.4%), and anxiety (0.3% to 1.1%)). Plaintiff does not explain how later *confirmation* of these numbers makes Defendants' earlier statements misleading. *Id.*

- The labels of both phentermine and topiramate include extensive warnings of possible psychiatric side effects (*e.g.*, SER38-40), and VIVUS disclosed the risk that these effects, as well as the shadow cast by adverse effects of other weight-loss drugs, could negatively affect Qnexa's approval chances (*e.g.*, SER127-130, 134).

These judicially noticeable *facts* highlight the insufficiency of Plaintiff's allegations.[16]

**Cognitive Results.** The same analysis applies to the complained-of statements about cognitive effects. Plaintiff asserts that Defendants'

---

[15] Plaintiff acknowledges the District Court's holding that Defendants' top-line summary addressed only "moderate" and "severe" adverse psychological events; he says the court erred by rejecting his claim that excluding less-severe events rendered these statements misleading. AOB32 (citing ER13). But the District Court's holding is consistent with with *Rigel*. 697 F.3d at 880. (Plaintiff's reference on the following page to omission of *more* serious events (AOB33) is presumably an error; it is *less* serious events that were not part of Defendants' initial disclosures.)

[16] Plaintiff accuses the District Court of mischaracterizing the record when it stated that FDA did not cite psychiatric results as a reason for its 2010 non-approval. AOB31. But Plaintiff does not claim the October 2010 CRL – the FDA's actual response to VIVUS's NDA – lists psychiatric issues as a reason for disapproval, ¶239; and the CRL does not.

42

statements that Phase 3 trial results showed no clinically significant change in overall cognitive function or effect on psychomotor skills were false or misleading because: (1) patients on Qnexa "had a 4 times higher risk of cognitive impairment" (*e.g.*, ER121-125¶¶57(a)-(e)), (2) cognitive event-related discontinuations occurred more frequently in Qnexa-treated subjects (*e.g.*, ER125-126 ¶¶55(g)-(h), ER135 ¶59(d)-(e)), and (3) Qnexa had "clinically relevant negative effects on cognitive function" (*e.g.*, ER125 ¶55(f), ER139 ¶¶60(b), 61(b)).

As with the psychiatric data, VIVUS disclosed that "[m]ost cognitive-related AEs were mild or moderate in severity."  SER36; *see also* SER51 (90% of neuropsychiatric adverse events (cognitive and psychiatric events together) were mild or moderate).  As for relevance, the FDA Memo notes at worst that "[t]he clinical significance of these imbalances [between adverse event levels] is unknown." SER104.[17]  And VIVUS again disclosed the cognitive-related discontinuations – along with expert analysis finding that "Qnexa at the doses tested does not appear to produce a clinically significant change in cognitive function in this patient population" – in an October 29, 2009 press release (referenced at ER171 ¶102).  *See* SER111-115.  Plaintiff

---

[17]  In its detailed FDA briefing document, VIVUS maintained its position that "no clinically meaningful effects on cognitive function … were observed over 1 year."  SER34.

does not dispute the data, just the conclusion.

The cognitive-effects data were not surprising either when first released or to the Committee, given topiramate's known cognitive side-effect profile.  ER252 ¶235 (Panel unconcerned with cognitive issues as "the adverse events were not unexpected and fell within as per [*sic*] the Topamax label.").[18]  As with psychiatric data, Plaintiff cannot allege that the CRL cited cognitive issues as a reason for FDA's initial disapproval of Qnexa (as again, it does not).  ER254 ¶239.

**Cardiovascular Results.**  Plaintiff asserts a litany of allegedly hidden cardiovascular issues to try to contradict Defendants' positive statements about Qnexa's favorable effect on cardiovascular *risk factors and co-morbidities*.  But as reduction of these risk factors was a secondary endpoint of the Phase 3 trials, these statements concerned Qnexa's *efficacy*, not *safety*.  The FDA and the Committee unequivocally confirmed those efficacy statements.  *E.g.*, SER102.  Qnexa's efficacy, *including* its positive impact on cardiovascular health, is unchallenged.

---

[18]  Plaintiff discounts the District Court's statement that "analyst commentary" suggested observed cognitive effects were expected side-effects of topiramate.  AOB34.  What the District Court *actually* said is that "market analysts, the FDA reviewer, and Committee members *all noted* that the observed cognitive effects were well-known side effects of topiramate."  ER13 (emphasis added).  Interestingly, Plaintiff quoted as purported "factual support" for his claim that Defendants' prior statements were misleading the same analyst discussion he now seeks to discredit.  ER254 ¶235.

As for *safety*, Plaintiff again complains that VIVUS's statements about cardiovascular side effects were false because: (1) "patients taking Qnexa reported an increased heart rate"; (2) "there was *potential* for cardiovascular risks, including tachycardia, arrhythmias, stunned myocardium, cardiomyopathy, and congestive heart failure … stroke and intracerebral hemorrhage"; and (3) during a Phase 1 trial "a depletion of potassium in patients was noticed" and patients "were provided with an increase in potassium…to mask the potential cardiovascular risk."  ER121 ¶55(a), ER127-132 ¶¶57(a)-(e).  None of these "reasons" substantiates Plaintiff's claims, as the District Court properly held.  ER14.

- The first parrots a statement by Dr. Day two days into the class period, accurately reporting an average heart rate increase of one beat per minute among Qnexa users, but concluding that this had "no statistical or clinical significance" given the measured improvement in other cardiovascular risk factors resulting from Qnexa use.  (ER150-151 ¶76(d) and (e)).  Again, Plaintiff only disputes VIVUS's interpretation, not the data.

- The second is not a fact; it is a grab-bag of cardiovascular-related issues mentioned by Committee members.  *See* SER62-65.  Again, the fact that a Committee member inquired about a possible condition does not equate to that condition being observed in the trials and linked to Qnexa, at a clinically significant level or otherwise; and Plaintiff offers no facts suggesting they were.  As the District Court held, "Plaintiff alleges no facts showing that Qnexa showed any adverse effects beyond those identified on the label for phentermine, which has been prescribed for more than 50 years."  ER14.[19]

---

[19]  At most, Plaintiff alleges that some on the Committee wanted longer-term studies of cardiovascular side effects.  *See, e.g.,* ER247 ¶223 (Dr. Thomas suggesting cardiovascular trial focused on a higher-risk group); ER249 ¶228

Plaintiff's opaque allegation about potassium issues in a *Phase 1* trial is irrelevant. Decreased potassium (hypokalemia) is a known potential side effect of topiramate (as Plaintiff acknowledges at ER263 ¶263) so it was unsurprising when VIVUS's briefing document disclosed a low incidence of hypokalemia among trial participants. SER33. In any event, as the District Court held, Plaintiff cites no Defendant statement about potassium issues or about the Phase 1 trial in his Complaint, and does not link his potassium allegations to anything relating to the Phase 3 trials. ER14.[20]

**Teratogenicity and Metabolic Acidosis.** Plaintiff's Complaint does not quote *any* statement (allegedly false or otherwise) from Defendants addressing either topic. ER14. Yet he claims that VIVUS's failure to disclose that Qnexa would likely receive a Pregnancy Category X label, and had the *potential*, like topiramate, for decreased bicarbonate levels rendered fraudulent its statements about Qnexa. *E.g.*, ER128 ¶57(b), ER140 ¶62(b), ER182 ¶116(k). But VIVUS's disclosures, in portions ignored by Plaintiff, repeatedly spoke to these very risks.

---

(Dr. Rogawski (who voted to approve) wanting more data on stroke risk). But they offer no facts suggesting Defendants knew this would block approval.

[20] Plaintiff faults the District Court for not inferring that VIVUS supplemented potassium in the Phase 3 trials. AOB37. But there is not even a suggestion in the Complaint that VIVUS did so. Plaintiff asks the Court to infer that VIVUS manipulated its Phase 3 trials, where he has made no such allegation, much less offered any facts to support one.

VIVUS's class period SEC filings disclosed that, while no pregnancy risks were observed during the trials, *if approved, Qnexa labeling would warn against use by women who are pregnant or may become pregnant*. SER119, SER129, SER174 (emphasis added); *see also* SER22 ("[T]his is not a medicine that should be used in women that want to get pregnant and if they become pregnant, they should stop taking [it] immediately.  So you're going to see that in our labeling.").  Potential risks of acidosis, a known side effect of topiramate, were also disclosed.  SER119; SER128; SER173; *see also* SER41-43 (Topamax label warnings).

### E.     Statements of General Optimism Are Not Actionable

Plaintiff complains about other Defendant comments broadly touting Qnexa's safety and expressing enthusiasm about Qnexa's trial results and future prospects.  But statements of general optimism cannot support a securities claim.  *E.g.*, *In re Copper Mountain Sec. Litig.*, 311 F.Supp.2d 857, 868-69 (N.D. Cal. 2004); *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005).[21]

---

[21] Plaintiff adds to his discussion of these generalized statements several objectively true specific statements about the data.  AOB39 ("drug-related SAEs were not different between Qnexa and placebo as well and clearly at a very low level" or "adverse events that we saw were few and there was no pattern of any one particular item.").  The District Court did not dismiss these as puffery, as Plaintiff claims, but rather held that they accurately described Qnexa trial results in the context of its components.  ER10-13.

Claims that Qnexa has an "excellent" or "compelling" risk/benefit profile (*e.g.* ER127 ¶57(a), ER142 ¶69(b), ER157 ¶86(c)), or that the studies have shown "remarkable" safety and efficacy (ER130 ¶57(d), ER140 ¶63), are not actionable.

> It is well settled that a complaint alleging violations of the securities laws may not rely upon statements that are true, or constitute puffery or ordinary expressions of corporate optimism.… Likewise, statements of opinion are insufficient to form the basis of a misrepresentation or omission complaint under § 10(b).

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F.Supp.2d 549, 557 (S.D.N.Y. 2004) (citations omitted); *accord Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1245 (N.D. Cal. 1998). In *Bristol-Myers*, statements that a drug was "a tremendous strategic opportunity," had "real blockbuster potential," had "potential to be one of the most exciting, if not the most exciting" cancer drugs and was "a first-in-class novel blockbuster drug for treating cancer" all were held to be non-actionable. 312 F.Supp.2d at 557-59. The same result should obtain here. *See also Philco*, 2011 WL 500694, at *6.

Plaintiff relies on *In re Quintel Entm't Inc. Sec. Litig.*, 72 F.Supp.2d 283, 294 (S.D.N.Y. 1999). AOB40. But that decision illustrates the chasm between actionable specificity and the generalities here. In *Quintel*, defendants made *specific* statements about the financial benefits of partnership with AT&T, including percentage increase in revenues, while

48

not disclosing that AT&T was scaling back the partnership. Defendants'
adjectives about Qnexa are not analogous and cannot satisfy the falsity
element of a 10(b) claim. *E.g.*, *Intuitive Surgical,* 2011 WL 3501733, at *11
("These statements, essentially 'feel good monikers' that hope springs
eternal, do not amount to securities violations under Plaintiff's current
allegations.").

### F.    Plaintiff's Claims Are Barred by the PSLRA Safe Harbors

Finally, Defendants' comments about Qnexa's prospects were
forward-looking statements protected under the PSLRA safe harbors. 15
U.S.C. § 78u-5(i)(1)(B); *see also Noble Asset Mgmt. v. Allos Therapeutics,*
2005 WL 4161977, at *9 (D. Colo. Oct. 20, 2005) (statements about FDA
approval prospects not actionable). Each VIVUS press release cited by
Plaintiff included warnings about the uncertainties of projections, and
referred investors to VIVUS's SEC filings, which were chock full of risk
factors and warned of the potential for the very result that occurred on July
15, 2010. *See supra* Part III.A.[22] In response to these cautions about the
unpredictable future, Plaintiff offers the boilerplate that "[t]o the extent there
were any forward-looking statements, there were no meaningful cautionary

---

[22]  *See, e.g.*, SER122-170 (Form 10-K included *48 pages* of risk factors).
Plaintiff's assertion that the SEC filings were not adequately specific – and
his bizarre Grand Canyon analogy (AOB45-46) – is belied by his failure to
point to a risk that was omitted from any VIVUS disclosure.

49

statements." ER276 ¶307.  The public record reflects otherwise, as does Plaintiff's failure to point to a risk VIVUS omitted to include.  VIVUS's disclosures render Defendants' statements non-actionable as a matter of law under the PSLRA safe harbors.  *See In re Bare Escentuals, Inc. Sec. Litig.*, 745 F.Supp.2d 1052, 1080 (N.D. Cal. 2010).[23]

Even without meaningful cautionary language, the PSLRA also protects forward-looking statements absent factual allegations showing that Defendants' projections were made with "actual knowledge" of their falsity. 15 U.S.C. § 78u-5(c)(1)(B).  As described below, Plaintiff cannot satisfy this standard.

## IV.   THE ALLEGATIONS DO NOT SUPPORT A STRONG INFERENCE OF SCIENTER

Plaintiff's failure to adequately plead scienter also compelled dismissal.  Plaintiff says the District Court's conclusion that VIVUS's statements about Qnexa were accurate and reasonable was possible only by ignoring the collective approach to evaluating scienter allegations required

_____

[23]  Plaintiff's contention that incorporating risk disclosures from SEC filings is impermissible (AOB45) is inaccurate.  Cautionary disclosures qualify and protect forward-looking statements whether or not they appear in the same document.  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122-23 (10th Cir. 1997); *In re Infonet Servs. Corp. Sec. Litig.*, 310 F.Supp.2d 1080, 1092-93 (C.D. Cal. 2003) (same).  Where plaintiffs rely on a fraud-on-the-market theory, all information incorporated by the market is relevant, including in referenced SEC filings.  *Desai v. General Growth Prop., Inc.*, 654 F.Supp.2d 836, 845-46 (N. D. Ill. 2009) (court may consider SEC filings in determining whether other statements were accompanied by cautionary language).

50

by *Matrixx* and *Tellabs*.  AOB46-47.  Any fair reading of the record shows just the opposite.  When Defendants' statements are viewed in light of *all* facts alleged and in the public domain, this is a story of honest optimism, not of deceit.

Rather than accept the reasonable (and true) story that VIVUS was legitimately excited about Qnexa Phase 3 trial results – results that without dispute showed efficacy at or beyond FDA approval benchmarks[24] and a safety profile consistent with Qnexa's long-approved component drugs – Plaintiff contends that VIVUS's expressed enthusiasm and confidence were phony.  But he pleads no specific facts to support this, much less that make his the more plausible or compelling story.  Nor does he explain why Defendants poured millions of dollars and vast amounts of other resources into clinical trials, an NDA, and an FDA approval process they purportedly knew were futile.  *E.g.*, *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1118 (9th Cir. 1989) (inference of bad faith dispelled by defendants' conduct staking the company's future on ongoing efforts).  The argument not only defies common sense but the actual history here:  Qnexa *was approved* on a second year of data that was consistent with the first.

---

[24]  SER102 ("Per the efficacy criteria outlined in the Division's 2007 draft guidance, all three doses of PHEN/TPM were efficacious for weight loss."); Dr. Burman, SER76 ("Qnexa does meet or exceed the agency's requirement for efficacy; I don't think there's any issue there.")

51

Although the District Court properly compared malicious and innocent inferences as required by *Tellabs*, Plaintiff cries foul because the District Court did not find those offered by Plaintiff "cogent and at least as compelling as any opposing inference." ER22 (citing *Tellabs*); *see* AOB47. To Plaintiff, the District Court "discounted" or "disregarded" his proffered inferences because it decided against him. But the District Court's well-reasoned discussion shows only that it weighed Plaintiff's thin assertions holistically against the more reasonable and plausible inference that Defendants were legitimately excited about Qnexa and its prospects, and found Plaintiff's assertions, viewed individually or collectively, to be lacking: "[A] 'collective' view of plaintiffs allegations does not approach a cogent and compelling inference of scienter, and certainly not one that is more plausible than that defendants genuinely believed in the promise of Qnexa." ER32.[25]

---

[25] Notwithstanding the District Court's expressly "collective" analysis, Plaintiff complains that the court improperly undertook a "dual inquiry" to the scienter question, contrary to *Matrixx*. AOB46-47 (citing ER22). Plaintiff's concern is curious as the "dual inquiry" standard appears more plaintiff-friendly, requiring examination of scienter allegations from two perspectives – individually and collectively – with dismissal only if the allegations fail under both. *Zucco*, 552 F.3d at 992. Regardless, it is not error to consider scienter in two steps so long as a holistic review occurs. This Court's recent decision in *In re VeriFone Holdings, Inc. Sec. Litig.*, on which Plaintiff relies, holds that "a dual approach remains permissible" after *Matrixx* so long as the court examined scienter holistically. 704 F.3d 694, 702 (9th Cir. 2012).

### A.     The Confidential Witness Allegations Add Nothing

Plaintiff attempts to allege scienter through assertions attributed to unidentified Confidential Witnesses ("CWs").  But these vague allegations say nothing about, for example, *what* information discounted VIVUS's statements about Qnexa, *when* that information was allegedly known, *who* knew it, and most importantly, *how* it contradicted any public statement.[26]

To begin, Plaintiffs' allegations do not support an inference that his CWs would even know information about these critical points (his contrary suggestions (AOB47-48) notwithstanding).  Four of the six CW's are not alleged to have had *any* connection to Qnexa, but are instead said to have been sales representatives for VIVUS's one marketed (erectile-dysfunction) drug (CW3-CW6).  *See* ER255-258 ¶243-48.  A fifth is said to have been a "scientist" in its New Jersey manufacturing facility alleged to have left VIVUS before the Qnexa Phase 3 trials concluded (CW2).  *Id.*  In short, Plaintiff fails to allege facts establishing his CWs as reliable sources.  *See Applestein v. Medivation*, *Inc.*, 2011 WL 3651149, *5 (N.D. Cal. Aug. 18, 2011) (adequate basis for CW reliability depends on CW's position in the

---

[26]  *See City of Livonia Employees' Ret. Sys. & Local 295/Local 851 v. Boeing Co.*, 2013 WL 1197791, at *5 (7th Cir. Mar. 26, 2013) (Allegations from "unnamed confidential sources of damaging information require a heavy discount.  The sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, may even be nonexistent").

company); *see also In re Adolor Corp. Sec. Litig*, 616 F.Supp.2d 551, 574-75 (E.D. Pa. 2009) (unclear how CWs would possess relevant information based on positions).

Even assuming the CWs' competence, the allegations add little. Plaintiff cites his CWs only to assert that there were "concerns" or "discussions" about potential safety issues or progress of the trials – *see, e.g.*, ER260 ¶253 ("constant discussion" about various health issues) or ER257 ¶248 (reports on trial progress) – hardly remarkable as one would certainly expect management discussions about these broad topics.  But Plaintiff does not describe what was actually said, much less where, when, or by whom – all basic requirements for pleading fraud.  *E.g. Ronconi*, 253 F.3d at 429. Most significant, Plaintiff does not explain how anything mentioned in the CW allegations either identified an actual safety issue or conflicted with VIVUS's contemporaneous public statements.  *See In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 351-52 (S.D.N.Y. 2011) (CW allegations that bank managers received reports "detailing significant and widespread problems" with the bank's lending insufficient where they "fail to specify which reports revealed the widespread lending problems, what information those reports contained, and whether the reports contradicted" defendants' public statements); *see also Constr. Laborers Pension Trust v. Neurocrine*

54

*Biosciences, Inc.*, 2008 WL 2053733, at *6 (S.D. Cal. May 13, 2008), *citing In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) ("Without specifics such as the time and place, and the anonymous witness's basis for knowledge and involvement in the conversation, the Court cannot infer defendants secretly [knew contradictory information] despite their public expressions of confidence.").

Almost none of the CW allegations actually links defendants Wilson or Day to the "constant discussion" of health matters. And in the rare case when Plaintiff alludes to Wilson or Day – through vague references that "senior management" "*should have been*" receiving progress reports on the trials – he again asserts no information that contradicts the public statements. *See* ER257 ¶248.[27] Plaintiff asserts that the District Court drew the "implausible inference that everyone at Vivus was aware of the problems

---

[27] Again, *Wachovia*, 753 F.Supp.2d at 352, is on all fours:

> [T]he majority of the CW allegations are either undated or pegged to an indefinite time period (*i.e.*, "after the acquisition").... This omission renders the task of matching CW allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement.

*See also Heywood*, 2006 WL 5701625, at *5 (rejecting CW allegations containing only generalized, speculative statements); *Shemian v. Research In Motion Ltd.*, 2013 WL 1285779, at *16 (S.D.N.Y. Mar. 29, 2013) ("[A]ssertions that defendants *must* have been aware of informants' concerns are insufficient to establish that defendants *were* aware of those concerns.") (original emphasis).

55

with Qnexa safety data except senior management." AOB50. The District

Court held no such thing; it ruled instead that Plaintiff had alleged no

specific information through CWs that contradicted any statement attributed

to Defendants. ER26.[28]

    At bottom, the CW allegations come nowhere near showing a

management consensus that Qnexa's potential risks threatened its approval

or commercial viability, much less that any of Defendants' public statements

were made with less than sincere and reasonable belief in their truth. *See*

*Apple Computer*, 886 F.2d at 1113; *AstraZeneca*, 559 F.Supp.2d at 471.

---

[28] Plaintiff's effort to use CWs to invoke the so-called "core operations" theory also falls short. AOB50-53. The Complaint simply alleges that Mr. Wilson and Dr. Day had hands-on involvement in VIVUS operations – something Defendants do not dispute – and then repeats Plaintiff's generalized list of "reasons" Defendants' statements were misleading. This is insufficient to invoke this theory – which cases admonish should not be applied excessively in any event. *See South Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008)).

    The District Court noted that, under *Tellabs*, core operations allegations are considered part of a holistic review. ER27 (citing *South Ferry*, 542 F.3d at 784). But the inference will generally not support a strong inference of scienter absent "additional detailed allegations about the defendants' actual exposure to information." *Id.* Here, no facts are pled relating to actual exposure to information, nor even any assertion about what specific information Defendants *might* have been exposed to, that contradicted what they were saying about Qnexa publicly. Accordingly, the District Court held Plaintiff's core operations theory to be "of minimal significance, and certainly is not sufficient to create a strong inference of scienter." ER 28 *citing Berson v. Applied Signal Tech, Inc.*, 527 F.3d 982, 989 (9th Cir. 2008).

**B.     Plaintiff's Additional Motive Allegations Do Not Change the Scienter Analysis**

Plaintiff's attempts to bolster his scienter allegations with claims about Defendants' personal and corporate financial objectives fare no better.

First, Plaintiff points to supposedly "suspicious stock sales." AOB56. But the sales by Mr. Wilson and non-defendant Guy Marsh (but by not Dr. Day) were, as Plaintiff acknowledges, pursuant to Rule 10b5-1 automatic trading plans entered into six months before the class period began. ER272-273 ¶¶295-96. There is no allegation that the Phase 3 trials were even completed, much less that results were known or knowable, at that time. Yet Plaintiff asserts that these non-discretionary sales support a scienter inference. AOB57-58. The law is otherwise. *Metzler Inv. GMBH v. Corinthian Colleges, Inc*., 540 F.3d at 1067 n.11 (9th Cir. 2008) (automatic sales may rebut inference of scienter); *see also Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1117 (N.D. Cal. 2003) (same). *See also Plevy v. Haggerty*, 38 F.Supp.2d 816, 834 (C.D. Cal. 1998) (sales by non-defendant insiders "irrelevant" to evaluating scienter of named defendants).

Nor were Mr. Wilson's sales unusual in timing or amount. His plan called for non-discretionary sales of 50,000-share blocks each time VIVUS's stock hit certain specified prices. SER181. That VIVUS's stock price hit those levels more during the class period than before does not render

57

Wilson's sales "dramatically out of line" with the past. *Metzler,* 540 F.3d at 1066, *citing Silicon Graphics*, 183 F.3d at 986. The automatic sales by Mr. Wilson (and *absence* of sales by Dr. Day) do nothing to undercut the more compelling inference that Defendants acted in good faith and without intent to deceive. *Tellabs*, 551 U.S. at 323.

Next, Plaintiff offers assertions about the individual defendants' incentive compensation, VIVUS's need for capital (and consequent stock offering) and the importance of Qnexa's success. *See* ER262-270 ¶¶275-83. All have been repeatedly held to be the sort of general corporate motives that could be said of most any corporation or corporate executive and therefore cannot support a cogent and compelling inference of scienter. *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002); *Neurocrine Biosciences*, 2008 WL 2053733, at *7; *accord Shemian*, 2013 WL 1285779, at *13. Indeed, Plaintiff's arguments directly counter this Court's recent holding, applying the *Tellabs* holistic approach, that similar allegations of corporate objectives do not support a strong inference of scienter. *Rigel*, 697 F.3d at 884. The District Court, citing *Rigel* and *Tellabs*, properly held that "even taking all the allegations of scienter collectively" Plaintiff's scienter allegations fail. ER29, 31, 33.

Nothing in Plaintiff's claims contradicts the far more plausible, non-

58

culpable explanation that Defendants reasonably believed in Qnexa's results, prospects for approval and potential marketability, and acted consistently with their stated beliefs. As the District Court held:

> [E]ven if the CW allegations and the other motive allegations could be viewed as sufficient to support an allegation of scienter, it remains plaintiff's burden to show a strong inference of scienter, which inference is both cogent and compelling, and as plausible as any non-culpable inference that defendants' optimism was honest. The court finds that plaintiff has not met that burden.

ER32. Plaintiff offers nothing to undermine that reasoned conclusion. This Court should affirm.

## V.     PLAINTIFF'S SECTION 20 CLAIMS FAIL FOR LACK OF A PRIMARY VIOLATION

Plaintiff's claims under Sections 20(a) and 20(b) of the Exchange Act require a primary violation of that Act. Because he fails to plead a primary violation of Section 10(b), his claims under Section 20 fail as well. *Lipton*, 284 F.3d at 1035; ER31.

## VI.     THE DISTRICT COURT PROPERLY DENIED LEAVE TO AMEND AGAIN

The District Court was within its discretion to dismiss the Complaint with prejudice. The Complaint was Plaintiff's third pleading effort. The District Court had previously identified specific deficiencies in Plaintiff's amended complaint and given him the opportunity to correct those deficiencies. *See Zucco*, 552 F.3d at 1007 (no error in denying leave to

59

amend as "it was clear that the plaintiffs had made their best case and had been found wanting"); *Metzler*, 540 F.3d at 1072 (affirming dismissal with prejudice where same deficiencies "persisted in every prior iteration" of complaint).  Plaintiff's inability to do so after three tries, despite adding *more than 100 pages* to his latest Complaint, is a "strong indication that the plaintiffs have no additional facts to plead."  *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1098 (9th Cir. 2002).

The decision cited by Plaintiff is not to the contrary.  There, this Court found the district court had abused its discretion because plaintiff had proffered that additional evidence was forthcoming that would add necessary details; had alleged the requisite detail as to many aspects of the alleged fraud; and "were endeavoring in good faith … to comply with Court guidance."  *Eminence Cap. LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003).  Here, in contrast, the District Court noted that Plaintiff had *not* complied with the court's guidance for amendment (ER11 n.2) and cited key factors that, according to *Eminence Capital*, were to be considered in denying leave – the failure to cure deficiencies, and the futility of amendment.  ER 33.  Denying Plaintiff a fourth bite at the apple was a proper exercise of discretion.

60

## VII.  CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's decision dismissing Plaintiff's Complaint with prejudice and its judgment for Defendants in this action.

DATED:     April 11, 2013            Respectfully submitted,

                                    HOGAN LOVELLS US LLP


                                    By */s/ Michael L. Charlson*
                                        Michael L. Charlson

                                    Attorneys for Defendants-Appellees
                                    Vivus, Inc., Leland F. Wilson and
                                    Wesley W. Day, Ph.D.

61

**CERTIFICATE OF COMPLIANCE PURSUANT TO FEDERAL
RULE OF APPELLATE PROCEDURE 32(A)(7)(C)
AND CIRCUIT RULE 32-1**

I certify that the attached brief is proportionately spaced, has a

typeface of 14 point or more, and contains 13,676 words.


DATED:      April 11, 2013          HOGAN LOVELLS US LLP


By */s/ Michael L. Charlson*
Michael L. Charlson

Attorneys for Defendants-Appellees
Vivus, Inc., Leland F. Wilson and
Wesley W. Day, Ph.D.

62

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, Defendants-Appellees Vivus, Inc., Leland F. Wilson and Wesley W. Day, Ph.D. state that they are not aware of any cases related to this action.

DATED:     April 11, 2013          HOGAN LOVELLS US LLP


                                   By */s/ Michael L. Charlson*
                                       Michael L. Charlson

                                   Attorneys for Defendants-Appellees
                                   Vivus, Inc., Leland F. Wilson and
                                   Wesley W. Day, Ph.D.

63

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 11, 2013, I electronically filed the foregoing Answering Brief of Defendants-Appellees with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

The participant listed below is not a registered CM/ECF user.  I have transmitted the foregoing document via first-class mail to the following:

William Scoville
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10019-0165

I further certify that paper copies of the Supplemental Excerpts of Record of Defendants-Appellees were transmitted via first-class mail on April 11, 2013 to the following:

| | |
|---|---|
| David A.P. Brower | Nicole M. Duckett |
| BROWER PIVEN | MILBERG LLP |
| 488 Madison Avenue, 8th Floor | 300 South Grand Avenue, Suite 3900 |
| New York, NY 10022 | Los Angeles, CA 90071-3149 |

Andrei V. Rado
William Scoville
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10019-0165

DATED:     April 11, 2013          HOGAN LOVELLS US LLP


By */s/ Michael L. Charlson*
     Michael L. Charlson

Attorneys for Defendants-Appellees
Vivus, Inc., Leland F. Wilson and
Wesley W. Day, Ph.D.